IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-00462-KLM

CHERRY CREEK MORTGAGE, LLC,

　　　　Plaintiff and Counter Defendant,

v.

THOMAS R. JARBOE,

　　　　Defendant and Counter Plaintiff.

_____

**ORDER**
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

　　　　This matter is before the Court on Plaintiff/Counter Defendant Cherry Creek Mortgage Company, LLC's ("Cherry Creek") **Amended Motion for Summary Judgment on Jarboe's Counterclaims Pursuant to Fed. R. Civ. P. 56** [#165] and on Defendant/Counter Plaintiff Thomas R. Jarboe's ("Jarboe") **Motion for Summary Judgment** [#169] (the "Motion"). Jarboe filed a Response [#178] in opposition to Cherry Creek's Motion [#165], and Cherry Creek filed a Reply [#184]. Cherry Creek filed a Response [#177] in opposition to Jarboe's Motion [#169], and Jarboe filed a Reply [#186]. The Court has reviewed the Motions, the Responses, the Replies, the entire case file, and the applicable law, and is sufficiently advised in the premises. Based on the following, Cherry Creek's Motion [#165] is **GRANTED in part and DENIED in part**, and Jarboe's Motion [#169] is **DENIED**.[1]

---

[1] This case has been referred to the undersigned for all purposes pursuant to 28 U.S.C. § 636(c), on consent of the parties. *See Consent* [#27]; *Order* [#29].

### I. Background[2]

Cherry Creek asserts a claim against Jarboe, a former employee of Cherry Creek, for breach of contract. *Compl.* [#3] ¶¶ 15-24.[3] Jarboe has three remaining counterclaims against Cherry Creek which assert breach of contract, conversion, and declaratory judgment. *Counterclaims* [#72] at 19-22 ¶¶ 60-71, 23 ¶¶ 80-85.

Prior to his employment with Cherry Creek, Jarboe worked as a regional branch manager for another mortgage company in Southern California. *Depo. of Sean McCluskey* ("McCluskey") [#177-2] at 21:15-21; *Decl. of Jarboe* [#170] ¶ 2. After meetings between Jarboe and Cherry Creek's executives, Cherry Creek sent Jarboe an "Employment Offer Agreement" on December 11, 2015. *Depo. of McCluskey* [#177-2] at 18:3-20:21; *Decl. of Jarboe* [#170] ¶¶ 2-5; *Jarboe's Ex. A*, *Employment Offer Agreement* [#174-1] (the "Employment Offer Agreement") at 2. Jarboe signed the Employment Offer Agreement on December 18, 2015. *Decl. of Jarboe* [#170] ¶ 5. The Employment Offer Agreement offered Jarboe the position of "Vice President, Regional Production Manager," with duties including oversight and management of twenty-two of Cherry Creek's branches in Southern California. *Employment Offer Agreement* [#174-1] at 2. The Employment Offer Agreement further provided Jarboe a minimum monthly override

---

[2] The facts referenced in the Background section are undisputed unless otherwise noted. For purposes of adjudicating the Motions [#165, #169], the Court recites in its Analysis section any disputed summary judgment evidence in a light most favorable to the non-movant. *See Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1186 (10th Cir. 2015) ("We . . . recit[e] all summary-judgment evidence in the light most favorable to . . . the nonmovant.").

[3] All other claims previously asserted against Jarboe by Cherry Creek have been voluntarily dismissed with prejudice. *See Stipulation* [#164].

payment, or "Override Guarantee," of $20,833 per month.[4]  *Employment Offer Agreement* [#174-1] at 2.  The Override Guarantee was linked to Jarboe's Responsibility Code ("RC") roll-up, which was associated with the branches he managed.  *See Depo. of Jeffrey May* ("May") [#171-11]; *Depo. of Michael Hogan* ("Hogan") [#177-4] at 134-35.  Sometime in early 2017, the parties agreed to continue the Override Guarantee payments to Jarboe.  *See Cherry Creek's Ex. 25*, *Emails Between Jarboe and Cherry Creek* [#177-3] (the "My Pay Emails") at 2; *Jarboe's Ex. 10*, *Internal Cherry Creek Emails* [#171-10] (the "Internal Emails") at 2.

When the parties executed the Employment Offer Agreement, they also entered into a "Regional Production Manager Agreement" (the "Regional Agreement").  *See Employment Offer Agreement* [#174-1] at 4-10.  The Regional Agreement provided

---

[4]  Cherry Creek defines "guarantee" as a term "commonly used to refer to an advance or draw against future commissions."  *Response* [#177] at 19 n.6 (citing 29 C.F.R. § 779.413(a)(5) ("Straight commission with "advances," "guarantees," or "draws."  This method of compensation [means] that the employee is paid a fixed weekly, biweekly, semimonthly, or monthly 'advance,' 'guarantee,' or 'draw.'  At periodic intervals a settlement is made at which time the payments already made are supplemented by any additional amount by which his commission earnings exceed the amounts previously paid."); 29 C.F.R. § 779.416(a) ("Employment arrangements which provide for a commission on goods or services to be paid to an employee of a retail or service establishment may also provide, as indicated in § 779.413, for the payment to the employee at a regular pay period of a fixed sum of money, which may bear a more or less fixed relationship to the commission earnings which could be expected, on the basis of experience, for an average period of the same length.  Such periodic payments, which are variously described in retail or service establishments as 'advances,' 'draws,' or 'guarantees,' are keyed to a time base and are usually paid at weekly or other fixed intervals which may in some instances be different from and more frequent than, the intervals for payment of any earnings computed exclusively on a commission basis.  They are normally smaller in amount than the commission earnings expected for such a period and if they prove to be greater, a deduction of the excess amount from commission earnings for a subsequent period, if otherwise lawful, may or may not be customary under the employment arrangement. . . .")).  Jarboe does not object to this extrinsic evidence of the contract term's definition or offer any contradictory evidence himself.  *See Reply* [#186] at 3-4 (discussing the Override Guarantee and stating that it was a "guaranteed minimum compensation to be paid monthly for Jarboe's labor on behalf of Cherry Creek"); *see also Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1313-14 (Colo. 1984) (en banc) ("In the absence of contrary manifestation of intent in the contract itself, contractual terms that have a generally prevailing meaning will be interpreted according to that meaning.").

Jarboe with a salary of $100,000 in addition to overrides pursuant to each "Branch Office Agreement" adopted by the parties as each new branch was opened.  *Id.* at 4. Throughout Jarboe's employment, Cherry Creek paid Jarboe the $20,833 monthly Override Guarantee and an additional $8,333 monthly as part of his base salary.  *See Decl. of Jarboe* [#170] ¶¶ 9, 12.  The Regional Agreement does not specifically permit Cherry Creek to recover deficits from Jarboe for losses suffered by branches under his supervision, although it does note that overrides are subject to the "terms and conditions of each Branch Office Agreement."  *Employment Offer Agreement* [#174-1] at 4.

Cherry Creek and Jarboe later entered into two successive "Non-Producing Branch Manager Agreements" (the "NPBM Agreements").  *See Jarboe's Ex. B*, *February Agreements* [#174-2]; *Jarboe's Ex. C*, *April Agreements* [#174-3].  Each NPBM Agreement included a "Compensation Agreement" ("Comp. Agreement").  *February Agreements* [#174-2] at 15; *April Agreements* [#174-3] at 14.  The two pairs of NPBM and Comp. Agreements were executed in February 2016 (the "February Agreements") and April 2016 (the "April Agreements").  *See generally February Agreements* [#174-2]; *April Agreements* [#174-3].  Both NPBM Agreements stated that neither execution nor performance of the contracts would, to Cherry Creek's knowledge, violate any state or federal law or regulation.  *February Agreements* [#174-2] at 9; *April Agreements* [#173-3] at 9.  The February Agreements provided a guaranteed minimum salary to Jarboe of $2,000 per month, and the April Agreements provided a guaranteed minimum salary of $5,000 per month.  *February Agreements* [#174-2] at 17; *April Agreements* [#174-3] at 16.  Furthermore, both NPBM Agreements contained an "Originator Net Loss Accommodations" provision, stating that:

> In the event the [branch managed by Jarboe] experiences a Net Loss on a cumulative basis, [Cherry Creek] shall consider such loss as a draw against future earnings and a personal liability of [Jarboe]. [Cherry Creek] reserves the rights to either deduct the draw amounts from future earned Overrides or make demand on [Jarboe] to cover such draw. If demand is made, [Jarboe] agrees that he/she will refund to [Cherry Creek], within 5 business days, any such draw balance.

*See February Agreements* [#174-2] at 18; *April Agreements* [#174-3] at 17.  A branch's "Net Income or Loss" is calculated as "Gross Revenue less Direct Expenses, Indirect Expenses, and Other Expenses."  *February Agreements* [#174-2] at 17; *April Agreements* [174-3] at 16.  "Other Expenses" include "distributions paid to [Jarboe]."  *February Agreements* [#174-2] at 17; *April Agreements* [174-3] at 16.

Jarboe's employment with Cherry Creek ultimately lasted from February 2016 to the end of June 2017.  *See Cherry Creek's Ex. 27*, *Jarboe Resignation Email* [#177-5] (the "Resignation Email") at 2.  Jarboe notified Cherry Creek of his resignation on June 16, 2017, citing the fact that he had "struggled" while working for Cherry Creek. *Resignation Email* [#177-5] at 2.  On June 20, Cherry Creek's Senior Vice President informed Jarboe that his "current accrued liability stood at $704,735 through May [2017]." *See Jarboe's Ex. 9*, *McCluskey Email* [#171-9] at 3.  This deficit was based on the operating deficits of the branches under Jarboe's oversight, including override payments received by Jarboe.  *See id.*; *Depo. of May* [#171-3] at 3:4-19; *February Agreements* [#174-2] at 18.  Cherry Creek now contends that Jarboe owes it a total amount of $1,079,423.21.  *See Jarboe's Ex. 14*, *Cherry Creek's Objections and Responses to Jarboe's Second Set of Interrogatories* [#171-14] (the "Cherry Creek Objections") at 13.

Cherry Creek brings a claim for breach of contract against Jarboe for failing to pay the "amount of any net loss to branch offices under [his] management" as purportedly

required by the Net Loss Accommodations provisions of the February and April Agreements.  *See Compl.* [#3] ¶ 17; *February Agreements* [#174-2] at 18; *April Agreements* [#174-3] at 17.  Jarboe seeks entry of summary judgment in his favor on this sole claim asserted by Cherry Creek.  *Motion* [#169] at 2.

Jarboe brings a counterclaim for breach of contract against Cherry Creek for failing to pay him guaranteed compensation, for violating Department of Housing and Urban Development ("HUD") rules and regulations by collecting expenses from an employee, and for violating state laws prohibiting employers from clawing back an employee's salary and forcing an employee to pay for the employer's operating expenses.  *Counterclaims* [#72] at 21-22 ¶¶ 66-71; *Response* [#178] at 12.  He also brings a counterclaim against Cherry Creek for conversion of office equipment and telephone numbers.  *Counterclaims* [#72] at 23 ¶¶ 80-85; *Response* [#178] at 18-19.  Finally, he brings a counterclaim for declaratory judgment against Cherry Creek.  *Counterclaims* [#72] at 19-21 ¶¶ 60-65.

## II.  Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex*, 477 U.S. at 325.  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works, Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead, must designate "specific facts

showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c).

"A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)).  Whether there is a genuine dispute as to a material fact depends on "whether the evidence presents a sufficient disagreement to require submission to a jury," or conversely, whether the evidence "is so one-sided that one party must prevail as a matter of law."  *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (quoting *Anderson*, 477 U.S. at 251-52).  A disputed fact is "material" if "under the substantive law it is essential to the proper disposition of the claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Anderson*, 477 U.S. at 248).  A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*, 477 U.S. at 248).  "Where the record taken as a whole could not lead a rational trier of fact to find for the [nonmovant], there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).  Interpretation of both statutory and contractual language are appropriately resolved as questions of law when adjudicating a motion for summary judgment.  *See Thomas*, 631 F.3d at 1160 ("Statutory interpretation is a matter of law appropriate for resolution on summary judgment."); *Echo Acceptance Corp. v. Household Retail Servs., Inc.*, 267 F.3d 1068, 1080 (10th Cir. 2001) (recognizing

that "[i]n general, the interpretation of a contract is a question of law") (citing *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 131, 1313 (Colo. 1984)).

In evaluating a motion for summary judgment, a court may consider admissible evidence only. *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1209–10 (10th Cir. 2010). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Concrete Works*, 36 F.3d at 1517. However, this standard does not require the court to make unreasonable inferences in favor of the nonmoving party. *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1276 (10th Cir. 2008). The nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case. *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994).

### III.    Analysis

**A.    Jarboe's Motion [#169]**

Under Colorado law, a claim for breach of contract requires proof of the following elements: "(1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff." *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (internal citations omitted). Here, Jarboe first argues that Cherry Creek failed to perform its obligation to pay him a minimum salary under the February and April Agreements. *Motion* [#169] at 14. Jarboe further argues that federal regulations and state law bar Cherry Creek's claim. *Id.* at 15. Finally, Jarboe contends that the April Agreements are unenforceable because they lack essential terms as well as mutuality of assent and obligation. *Id.* at 22-23. The Court first considers whether Cherry Creek failed to perform its minimum salary obligation.

### 1.      Whether Cherry Creek Failed to Perform

Jarboe argues that Cherry Creek did not perform because it failed to pay him a "guaranteed minimum salary" of $2,000 per month under the February Agreements and $5,000 per month under the April Agreements.  *Motion* [#169] at 14.  The parties agree that Cherry Creek paid Jarboe $8,333 per month in base salary throughout his employment.  *See id.* at 19; *Response* [#177] at 19.  Jarboe contends that while this amount satisfied Cherry Creek's obligation under the Regional Agreement, it did not satisfy the additional amounts later agreed to in the February and April Agreements. *Motion* [#169] at 15.  Cherry Creek responds that it paid Jarboe all amounts owed because the salary provisions in the Regional, February, and April Agreements were integrated, rather than aggregable.  *Response* [#177] at 13.  Cherry Creek emphasizes that the Regional and NPBM Agreements each contained a merger clause providing that the respective document constituted the parties' entire agreement.[5]  *Id.*; *see Employment Offer Agreement* [#174-1] at 8; *February Agreements* [#174-2] at 12; *April Agreements* [#174-3] at 12.  Therefore, Cherry Creek argues that it only owed Jarboe the minimum salary guaranteed in the most recent contract—$5,000 per month under the April Agreements—because the April Agreements superseded the previous contracts.  *See April Agreements* [#174-3] at 12.

The key question regarding this issue is whether the April Agreements' merger clause constitutes a novation, superseding the prior February Agreements and the Regional Agreement.   "A novation extinguishes a previously existing contract by

---

[5]  In their briefs, the parties refer to this provision as an "integration clause."  *See generally Motion* [#169]; *Response* [#177]; *Reply* [#186].   The terms integration clause and merger clause are synonymous.  *See Integration Clause*, Black's Law Dictionary (11th ed. 2019) ("Also termed merger clause; entire-agreement clause.").

substituting a new contract or obligation." *Phoenix Power Partners, L.P. v. Colo. Pub. Utils. Comm'n*, 952 P.2d 359, 364 (Colo. 1998).[6]   "[M]ere modification [of the prior contract] will not suffice; anything remaining of the original obligation prevents a novation." *Crew Tile Distrib., Inc. v. Porcelanosa Los Angeles, Inc.*, No. 13-cv-3206-WJM-KMT, 2016 WL 8609397, at *9 (D. Colo. Sept. 9, 2016) (citing *Moffat Cnty. State Bank v. Told*, 800 P.2d 1320, 1323 (Colo. 1990)).   For a novation to exist, four requirements must be met: "(1) a previous valid contract[;] (2) agreement between the parties to abide by the new contract[;] (3) a valid new contract[;] and (4) extinguishment of the old contract by substitution of the new one." *Id.*

Determination of whether a new agreement acts as a novation is "ordinarily a question of fact, and proof of a novation may be established by evidence of an express understanding to this effect or by circumstances showing such assent." *Moffat*, 800 P.2d at 1323 (citing 15 *S. Williston on Contracts* § 1873B (3d ed. 1972)).   However, "a court can determine intent of the parties based on unambiguous terms set forth in a new agreement." *Nw. Bldg. Components, Inc. v. Adams*, No. 22-cv-00790-CMA-KLM, 2022 WL 1689293, at *4 (D. Colo. May 26, 2022) (citing *Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1237 (11th Cir. 2008)).   While the inclusion of a merger clause may establish a novation as a matter of law, the new agreement must clearly show the parties' intent to extinguish the prior obligation. *Stillwater Mining Co. v. Power Mount Inc.*, No. 14-cv-2475-

---

[6]  Interpretation of a contract is a matter of state law. *DIRECTV, Inc. v. Imburgia*, 136 U.S. 463 (2015).  The Court has previously held that the Colorado choice-of-law provision in the contracts between the parties is enforceable. *See Order* [#159] at 13.  Further, both parties cite to Colorado case law in their briefing. *See Response* [#177] at 13 n.3; *Reply* [#186] at 5.  The Court therefore applies Colorado law for purposes of interpreting the Agreements between the parties.  *See Johnson v. Riddle*, 305 F.3d 1107, 1118 (10th Cir. 2002) ("When the federal courts are called upon to interpret state law, the federal court must look to the rulings of the highest state court, and, if no such rulings exist, must endeavor to predict how that high court would rule.").

WYD-CBS, 2016 WL 9735770, at *3 (D. Colo. Aug. 16, 2016) (finding a merger clause insufficient to create novation where other portions of a contract purported to amend a prior agreement and there was "room for debate" as to the parties' intentions).

Here, the Court first finds that there is no genuine issue of material fact that the April Agreements constitute a novation of the February Agreements. The April Agreements clearly and comprehensively extinguish the terms of the February Agreements. *See id.* (noting that a new contract with a merger clause can establish novation when it comprehensively addresses obligations under prior agreements); *compare February Agreements* [#174-2] *with April Agreements* [#174-3]. Therefore, whether the April Agreements effect a novation of the Regional Agreement is the remaining question. As an initial matter, the Court notes that the April Agreements satisfy the first three requirements of a novation. As to the first two elements, neither party contests that the Regional Agreement is valid, nor that the parties agreed to be bound by the April Agreements. *See Crew Tile*, 2016 WL 8609397, at *9. Furthermore, as explained in Section III.C., *infra*, the Court finds that the April Agreements are valid, satisfying the third element of a novation. *See id.* The Court therefore turns to the final element of a novation, i.e., whether the April Agreements unambiguously extinguish and substitute for the Regional Agreement. For the reasons stated below, the Court concludes that they do not, and thus finds that genuine issues of material fact persist regarding whether the parties intended that the April Agreements would extinguish the Regional Agreement.

The April Agreements' merger clause states in relevant part that the Agreements "constitute[ ] the entire agreement of the Parties with respect to the subject matter hereof

and supersede[ ] all prior and contemporaneous agreements and understandings . . . ." *April Agreements* [#174-3] at 12.  However, such a broadly written merger clause does not automatically extinguish the Regional Agreement.  *See Crew Tile*, 2016 WL 8609397, at *9-10 (finding that a merger clause stating that a contract "supersedes and takes place of all prior agreements" was insufficient to establish novation on summary judgment when the contract did not address "numerous issues" covered by prior agreements, and that a factual issue remained as to the parties' intent); *but see Nelson v. Elway*, 908 P.2d 102, 107 (Colo. 1995) (enforcing a broad and unambiguous merger clause, noting that where "sophisticated parties who are represented by counsel have consummated a complex transaction and embodied the terms of that transaction in a detailed written document, it would be improper for this court to rewrite that transaction by looking to evidence outside the four corners of the contract to determine the intent of the parties").

As in *Crew Tile Distribution, Inc. v. Porcelanosa Los Angeles, Inc.*, 2016 WL 8609397, the April Agreements leave unaddressed multiple topics from the Regional Agreement.  First, the "General Business Conduct" sections in the competing agreements appear to describe parallel, rather than replaced, job duties relating to Jarboe's dual positions as Regional Production Manager and Branch Manager/Loan Originator.  *See Employment Offer Agreement* [#174-1] ¶ 5; *April Agreements* [#174-3] at 3.  Jarboe continued to list his job title as "VP-Regional Production Mgr." in his email signature well after the April Agreements were executed, suggesting his belief that the April Agreements only modified his employment relationship with Cherry Creek under the Regional Agreement.  *See, e.g.*, *My Pay Emails* [#177-3] at 2.  Furthermore, the April Agreements fail to reconcile Cherry Creek's guaranteed minimum salary of $5,000 per month with the

$100,000 base salary stipulated in the Regional Agreement.  The parties offer competing interpretations of record evidence regarding Jarboe's and Cherry Creek's intentions as to these salary provisions.  *See Response* [#177] at 13; *Reply* [#186] at 6.

Finally, the Regional Agreement's merger clause requires that a future agreement "specifically refer[ ]" to the Regional Agreement in order to modify, amend, or terminate it.  The April Agreements make no reference to the Regional Agreement anywhere in their twenty-one pages.   The Court does not hold that the Regional Agreement's specific reference requirement in its merger clause single-handedly prevents novation if future agreements fail to make perfunctory reference to the Regional Agreement.   However, failure to reference the earlier agreement, even indirectly, cuts against a finding that the April Agreements unambiguously show the parties' intent to extinguish the Regional Agreement.  *See Crew Tile*, 2016 WL 8609397, at *10 (citing *Andrikopoulos v. Broadmoor Mgmt. Co.*, 670 P.2d 435, 440-41 (finding no novation on summary judgment "where subsequent contract contained no reference to the previous contract") (internal quotation marks, brackets, and ellipses omitted)); *cf. Nw. Bldg. Components*, 2022 WL 1689293, at *6 (finding unambiguous intent to effect a novation based on merger clause, new contract's explicit statement of intent to fully resolve all issues relating to parties' employment relationship, and new contract's coverage of terms contained in all prior agreements).

The available evidence, both based on the terms of the Regional and April Agreements and extrinsically, presents conflicting views of whether the parties intended to extinguish the Regional Agreement.  Deciding whether these facts are sufficient to overcome the April Agreements' broad merger clause is an issue for the fact-finder rather

than for the Court on summary judgment.  *See Crew Tile*, 2016 WL 8609397, at *10 (noting that "competing inferences only confirm that the factual issue of whether a novation occurred is not appropriate for summary judgment").  Accordingly, Jarboe's Motion [#169] is **denied** to the extent that it relates to Cherry Creek's failure to perform.

### 2. Federal Regulations and State Law

Jarboe argues that Cherry Creek's claim violates both federal regulations and state law.  *Motion* [#169] at 15.  The Court considers both aspects of this argument in turn.

### a. Federal Regulations

Jarboe claims that Cherry Creek's attempt to recover net losses from branches under his oversight violates HUD regulations.  *Motion* [#169] at 16.  However, Jarboe only cites to the HUD Handbook, not to formal regulations.  *See generally id.*; *Reply* [#186].  Provisions of the HUD Handbook do not have the force of law and are only relevant to evaluating whether an agency acted capriciously amounting to an abuse of discretion. *Anderson v. U.S. Dep't of Hous. & Urb. Dev.*, 701 F.2d 112, 114 (10th Cir. 1983) ("The HUD Handbook contains '"instructions," "technical suggestions," and "items" for consideration.'  *Thorpe v. Hous*[.] *Auth*[.], 393 U.S. 268, 275 . . . [(1969)].  It establishes no private cause of action.  The Handbook provisions are pertinent only to the question of capricious action amounting to abuse of discretion.") (internal citation omitted); *see also Mathews v. PHH Mortg. Corp.*, No. 20-cv-00200-JFH-JFJ, 2020 WL 5260813, at *2 (N.D. Okla. Sept. 3, 2020) ("HUD Handbooks do not consist of binding regulations, nor do they impose any binding obligations or legal duties upon parties.") (citation omitted); *Carson v. Est. of Golz*, No. 17-cv-01152-RBJ-MEH, 2018 WL 4090866, at *6 (D. Colo. Aug. 28, 2018) ("And the Tenth Circuit has reaffirmed, '[T]he HUD Handbook . . . is not law.' . . .

Rather, it is 'intended for internal use for the information and guidance of HUD officials' and has 'no binding force.'") (citing *United States v. Hauck*, 980 F.2d 611, 614 (10th Cir. 1992)); *Williams v. Hanover Hous. Auth.*, 871 F. Supp. 527, 531-34 (D. Mass. 1994) (collecting cases that show how "[c]ourts have consistently held that government agenc[ie]s' handbooks are not legally binding but merely advisory").

Therefore, because Jarboe identifies federal regulations only in the form of a nonbinding HUD Handbook as opposed to formal regulations, he has not shown that Cherry Creek's claim violates federal law.[7]  Thus, summary judgment in favor of Jarboe on this basis is inappropriate.[8]

### b.    Colorado Law[9]

For the purposes of adjudicating the Motion [#169], the Court assumes, without deciding, that the Colorado Wage Claims Act (the "CWCA") applies to Jarboe.  Jarboe argues that "Colorado . . . law prohibit[s] employers from requiring employees to repay their salaries . . . ."  *Motion* [#169] at 22.[10]  Under the CWCA, "'[w]ages' or 'compensation'

---

[7]  This finding is supported by the fact that Cherry Creek contacted and later deposed HUD attorneys who ultimately concluded that the April Agreements do not violate HUD regulations which *do* have binding authority.  *Response* [#177] at 14-15.

[8]  Cherry Creek's Motion [#165] seeking entry of summary judgment in its favor in connection with HUD and federal law is addressed in § III.B.1. below.

[9]  The Court declines to address yet again Jarboe's arguments that California law should govern the validity of the February and April Agreements.  The Court has previously found that the broadly written Colorado choice-of-law provision in the Agreements is enforceable and therefore precludes the application of California law to the employment relationship at issue here.  *See Order* [#188] at 11; *Order* [#159] at 8; *Order* [#59] at 10.

[10]  Jarboe further argues that Colorado law prohibits employers from requiring employees to repay their expenses.  *Motion* [#169] at 22.  The Court rejects this argument because Jarboe exclusively provides authority relating to the recovery of wages and salaries under Colorado law.  *See generally id.*; *Reply* [#186].  Furthermore, Cherry Creek has conceded that it is not seeking to recover business expenses from Jarboe.  *See Response* [#177] at 21.

means: . . . bonuses or commissions *earned* for labor or services performed in accordance with the terms of any agreement between an employer and employee." Colo. Rev. Stat. Ann. § 8-4-101(14)(a)(II) (emphasis added).  The CWCA further provides that:

> All wages or compensation . . . *earned* by any employee . . . shall be due and payable for regular pay periods of no greater duration than one calendar month or thirty days, whichever is longer, and on regular paydays no later than ten days following the close of each pay period unless the employer and the employee shall mutually agree on any other alternative period . . . .

Colo. Rev. Stat. Ann. § 8-4-103(1)(a) (emphasis added).

However, "[n]o amount is considered to be wages or compensation until such amount is *earned*, vested, and determinable, at which time such amount shall be payable to the employee . . . ."  Colo. Rev. Stat. Ann. § 8-4-101(14)(a)(I) (emphasis added).  In the context of summary judgment, "[i]n order to establish a violation of the CWCA, [a party] must show he was owed commissions that were *earned*, vested, and determinable under the terms of the Offer and the parties' course of conduct at the time of his . . . termination."  *Kirkland v. Robert W. Baird & Co., Inc.*, No. 18-cv-02724-MSK-SKC, 2020 WL 1452165, at *8 (D. Colo. Mar. 25, 2020) (citing *Barnes v. Van Schaack Mortg.*, 787 P.2d 207, 209 (Colo. App. 1990) (stating that the CWCA applies "only to compensation that has been earned under the employment agreement.")).

Here, the parties do not dispute that the Employment Offer Agreement provided Jarboe a minimum monthly override payment, or "Override Guarantee," of $20,833 per month. *Employment Offer Agreement* [#174-1] at 2.  The Override Guarantee was linked to Jarboe's RC roll-up, which was associated with the branches he managed. *See Depo. of May* [#171-11]; *Depo. of Hogan* [#177-4] at 134-35.  Cherry Creek further points to evidence that Earned Overrides were based on the cumulative net income or loss of the

branches managed by Jarboe.  *Employment Offer Agreement* [#174-1] at 2 ("Should your earned overrides exceed the monthly guarantee you will receive the amount of those earned overrides in excess of the guarantee."); *February Agreements* [#174-2] at 17 § 3.1 (stating that Cherry Creek "will pay [Jarboe] an Override in the amount of 100% of the Branch Net Income which is based upon the Gross Revenue less Direct Expenses, Indirect Expenses and Other Expenses for the period"); *April Agreements* [#174-3] at 16 § 3.1 (same); *Ex. 23, Depo. of Jarboe* [#177-1] at 174:18-175:3 ("I believe I was supposed to [receive compensation that was tied to my management for the branches], but it never materialized as the guaranteed income that I received.  Well, the compensation that I might have received or potentially could have received was never, never materialized, because I was still on a guarantee that was more than that amount would have been."); *Ex. 25, Apr. 2, 2017 Email from Stacey L. Harding, Senior VP of Cherry Creek Mortgage, to Jarboe* [#177-3] at 2 ("My recollection is that we agreed to continue the monthly amount to you (assigned to your rollup RC beginning the 2nd year of employment) regardless of whether or not the RC rollup balance was sufficient to cover the salary."); *Ex. 26, Depo. of Hogan* [#177-4] at 134:9-135:25 (stating that the roll-up account was created because "Jarboe wanted one profit and loss statement to be able to track the information out of all the cost centers that reported up under him. . . .  [The roll-up account] does not include line by line income for . . . specific branches. . . .  It takes the bottom line of each of those individual branches, so one number – it nets all of the income and expenses to get down to a bottom line, and then it takes that bottom line number and rolls it up to the roll-up cost center.").  In other words, Cherry Creek presents evidence that the Override Guarantee pertaining to Jarboe was not based on labor he performed but was instead an advance

on future Branch Net Income, which he never earned. *Response* [#177] at 19. The Court has found no legal authority, and Jarboe has provided none, that an employer is prohibited from recouping "unearned compensation" provided in the form of overrides.

Therefore, Jarboe has not shown that Cherry Creek's claim violates state law, and thus has not shown that there is no genuine issue of material fact on this aspect of the claim. Accordingly, summary judgment in favor of Jarboe on this basis is inappropriate.[11]

### 3. Validity of the April Agreements

The primary goal of contract interpretation is to give effect to the written expression of the parties' intent. *Ad Two, Inc. v. City & Cnty. of Denver*, 9 P.3d 373, 376 (Colo. 2000). Where the words of a written contract are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent. *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015). Interpretation of a contract is a question of law where the contract's construction does not depend on extrinsic evidence and where the language is susceptible to only one reasonable interpretation. *Zink v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 13 F.3d 330, 332 (10th Cir. 1993); *see also Stegall v. Little Johnson Assoc., Ltd.*, 996 F.2d 1043, 1048 (10th Cir. 1993) (applying Colorado law); *Evensen v. Pubco Petroleum Corp.*, 274 F.2d 866, 872 (10th Cir. 1960). Interpretation of a contract is a question of fact only when a contract term is found to be ambiguous. *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909 (Colo. 1996). The provisions of a contract are ambiguous when they are subject to more than one reasonable interpretation. *Union Ins. Co. v. Houtz*, 883 P.2d 1057 (Colo. 1994).

---

[11] Cherry Creek's Motion [#165] seeking entry of summary judgment in its favor in connection with Colorado state law is addressed in § III.B.1. below.

"Whether a contract exists when 'the evidence is conflicting or admits of more than one inference' is a question for the jury."  *Clingman v. Drive Coffee, LLC*, No. 20-cv-01485-RBJ, 2021 WL 4990303, at * (D. Colo. Oct. 27, 2021) (quoting *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 887 (Colo. 1986)).  Here, Jarboe argues that the April Agreements are invalid because they are missing essential terms relating to how profit is calculated in relation to market price, and they therefore reflect a lack of mutual assent/obligation.[12]

Under Colorado law, "[m]utuality of obligation is required to form a contract . . . ." *Scarlett v. Air Methods Corp.* 538 F. Supp. 3d 1205, 1226 (D. Colo. 2021).  In other words, a valid contract "'requires a bargain in which there is a manifestation of mutual assent to the exchange and consideration.'"  *Hickerson v. Pool Corp.*, No. 19-cv-02229-CMA-STV, 2020 WL 5016938, at *5 (D. Colo. Aug. 25, 2020) (quoting *Vernon v. Qwest Commc'ns Int'l, Inc.*, 857 F. Supp. 2d 1135, 1149 (D. Colo. 2012)).  "[I]llusory promises, . . . which render performance wholly discretionary, cannot form the basis of an enforceable contract."  *Cahey v. Int'l Bus. Machs. Corp.*, No. 20-cv-00781-NYW, 2020 WL 5203787, at *15 (D. Colo. Sept. 1, 2020) (citing *Vernon*, 857 F. Supp. 2d at 1153-54 (explaining that "an illusory contract is said to lack mutuality of obligation")).

---

[12]  In a footnote in his Motion [#169], Jarboe also states that "branch" was not adequately defined by the parties in the agreements.  *See Motion* [#169] at 24 n. 8 (referencing *id.* at 22-23).  A contract term is ambiguous "if it is fairly susceptible to more than one interpretation."  *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 912 (Colo. 1996).  At best, given the very limited information before the Court, the term appears to be ambiguous regarding which branch the term referred to or whether it referred to *each* branch managed by Jarboe.  "[T]he meaning of [an ambiguous term] is generally an issue of fact to be determined in the same manner as other disputed factual issues," i.e., by the jury.  *Id.*  Thus, based on the limited briefing provided, the Court cannot find that entry of summary judgment on Cherry Creek's breach of contract claim is appropriate on this basis alone.

"A contract only exists when the parties have a meeting of the minds as to all essential terms of the contract." *Clingman*, 2021 WL 4990303, at *8 (citing *Jorgensen v. Colo. Rural Props., LLC*, 226 P.3d 1255, 1260 (Colo. App. 2010)). "The parties need not discuss every material term for there to be a meeting of the minds if a party can show that both parties knew and agreed to the term." *Clingman*, 2021 WL 4990303, at *8 (citing *Harper v. Mancos Sch. Dist. RE-6*, 837 F. Supp. 2d 1211, 1218 (D. Colo. 2011)). "A material term goes to the root of the matter or essence of the contract. Materiality must be assessed in the context of the expectations of the parties at the time the contract was formed." *Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 64 (Colo. 2005) (internal citation omitted)). "'The law is clear that although the parties may intend to enter into a contract, if essential terms are omitted from their agreement, or if some of the terms included are too indefinite, no legally enforceable contract will result.'" *Brightspot Sols., LLC v. A+ Prods., Inc.*, No. 20-cv-03335-MEH, 2021 WL 2935942, at *5 (D. Colo. July 13, 2021) (quoting *Ellis Canning Co. v. Bernstein*, 348 F. Supp. 1212, 1223 (D. Colo. 1972)).

Cherry Creek points to evidence that the relevant agreements explained how the "market price" was determined. *Response* [#177] at 23; *April Agreements* [#174-2] at 16 § 1.3.1.2 (defining "Market Price" as Cherry Creek's "price provided to the Branch"). "Market Price" was one part of "Gross Revenue," which was "[t]he loan related revenue and fees associated with the loans originated by the Branch." *April Agreements* [#174-2] at 16 § 1.3.1. The Court notes that this evidence is, at best, thin regarding how "market price" was to be calculated pursuant to the contract. In fact, Jarboe points to opposing evidence from Cherry Creek's Rule 30(b)(6) deposition that, "typically," calculation of the market price set by Cherry Creek would be set forth in "an addendum" to the "branch

manager agreement," laying "out the specific basis point amount for these fees." *Rule 30(b)(6) Depo. of Cherry Creek* [#171-7] at 57:4-23).  Here, though, there was no such addendum or other specific agreement "setting out the market price that would be allocated to the branches [Jarboe] was responsible for managing as a regional manager." *Id.* at 57:16-58:12.

However, the fact that the contract does not specify how to calculate market price is not determinative here because of Jarboe's explicit agreement in the contract that Cherry Creek would provide the market price.  *See April Agreements* [#174-2] at 16 § 1.3.1.2 (defining "Market Price" as "[Cherry Creek's] price provided to the Branch"); *see Ad Two, Inc. v. City & Cnty. of Denver*, 9 P.3d 373, 376 (Colo. 2000) (stating that contract language "must be examined and construed in harmony with the plain and generally accepted meaning of the words employed").  Pursuant to the contract, Jarboe retained no right to calculate "market price" or to define how that price was calculated.  *See April Agreements* [#174-2] at 16 § 1.3.1.2.  Although the contract does not specify how to calculate "market price," Jarboe provides no legal authority that an agreement *must* do so in order to be legally enforceable where the contracting parties have given discretion to one party to make that determination.  In short, the law requires no meeting of the minds or mutual assent on how to calculate the market price where the contract gave Cherry Creek the discretion to calculate and provide that number.

This is not a case like *Jorgensen v. Colorado Rural Properties, LLC*, 226 P.3d at 1260, where "the parties simply took different positions in the bargaining process and no agreement was reached as to either side's proposed term."  In *Jorgensen*, the parties made no agreement on how to split commissions from particular transactions.  226 P.3d

at 1260.  There, the essential term regarding division of commissions was "so uncertain it could [not be] determined whether or not [the contract had] been breached," and therefore the Court found that "there [was] no contract."  *Id*.  Here, viewing the evidence in a light most favorable to Cherry Creek as the non-movant, the contract gave Cherry Creek the authority to determine the market price, and the parties chose not to define precisely how Cherry Creek was required to make that calculation.

Of course, under Colorado law, every contract contains the implied covenant of good faith and fair dealing.  *Doe v. Univ. of Denver*, 516 P.3d 946, 956 (Colo. App. 2022) (citing *Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 466 (Colo. 2003)).  "The duty of good faith and fair dealing applies 'when the manner of performance under a specific contract term allows for discretion on the part of either party.'"  *Doe*, 516 P.3d at 956 (quoting *City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006)).  "Whether a party acted in good faith is a question of fact which must be determined on a case by case basis."  *Doe*, 516 P.3d at 956 (quoting *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 499 (Colo. 1995)).  Here, the parties' agreement explicitly gives Cherry Creek the discretion to calculate the market price.[13]  *April Agreements* [#174-2] at 16 § 1.3.1.2.  Thus, under Colorado law, Cherry Creek was required to calculate the market price in good faith.  *See*

---

[13] Cherry Creek presents evidence that it calculated market price from the revenue credited to a branch for each loan it closed, an amount determined by the branch margins on the loan, which was based, in part, on each branch's market, the loan program, loan originator compensation, and branch operating costs.  *Response* [#177] at 23 (in part citing *Depo. of Michael Hogan* [#177-4] at 123:18-25 ("Branch margin is a rate that is paid out or credited to a cost center based on a contractual agreement with the branch manager for this particular cost center. . . .  It is a revenue calculation that is allocated to this branch operating statement."), 184:19-22 ("The market price is a line item that is on the branch operating statement.  It is a general ledger account that gets revenue credited to it for each loan that closes.  Generally, that market price is the branch margin on the loan."); *Depo. of Jarboe* [#177-1] at 180:22-181:13 (stating that Jarboe's role in setting the branch margin for his branch consisted of "consultant" and that he and his co-branch manager would have both "set the margin, the branch margin for this branch")).

*Doe*, 516 P.3d at 956.  The Court takes no position on whether the specific calculations made by Cherry Creek involving setting the market price (and related tasks such as allocating the deficits, if any, from Jarboe's branches to his Roll-up RC, and/or setting income and expense items) was reasonable and complied with the covenant of good faith and fair dealing.  *See Response* [#177] at 23-25.  It is the provenance of the jury as the finder of fact to determine whether Cherry Creek did so.  *See id.*

Thus, the Court cannot find, as Jarboe argues, that the April Agreements are invalid because they are missing essential terms, and that they therefore lack mutual assent/obligation.   Therefore, summary judgment in favor of Jarboe on this issue is inappropriate.

In conclusion, having reviewed the parties' arguments, the Court finds that genuine issues of material fact remain with respect to Cherry Creek's breach of contract claim, and that summary judgment in favor of Jarboe is not appropriate.  Accordingly, Jarboe's Motion [#169] is **denied**.

## B.    Cherry Creek's Motion [#165]

Cherry Creek moves for entry of summary judgment in its favor on Jarboe's three remaining counterclaims: (1) breach of contract, (2) conversion, and (3) declaratory judgment.

### 1.    Breach of Contract

Jarboe states that Cherry Creek breached their agreements in three ways: (1) by "failing to pay the compensation – wages – guaranteed under those agreements," (2) by "violating HUD rules and regulations by collecting its expenses from an employee," and (3) by "violating state laws prohibiting employers from clawing back an employee's salary

and forcing an employee to pay for the employer's operating expenses." *Response* [#178] at 12.  In Section III.A. above, the Court addressed whether there are genuine issues of material fact with respect to Cherry Creek's claim that Jarboe breached their agreements.  Here, the Court addresses whether there are genuine issues of material fact with respect to Jarboe's counterclaim that Cherry Creek breached their agreements. However, the arguments made by the parties are materially the same regarding both Cherry Creek's claim and Jarboe's counterclaim, and for essentially the same reasons stated above, the Court concludes as follows.

First, regarding Cherry Creek's alleged failure to pay compensation, the Court found in § III.A.1. above that there are issues of material fact regarding whether Cherry Creek owes Jarboe any remaining sums under the contracts.  No new argument is presented here on this point, and for the reasons stated above, the Court finds there are genuine issues of material fact which must be decided by a jury.

Second, regarding Cherry Creek's compliance with HUD rules and regulations, the Court found in § III.A.2.a. above that the HUD Handbook is not covered by Cherry Creek's contractual obligation to comply with "all rules and regulations" promulgated under "any federal, state, local or foreign statute or law."  Thus, to the extent Jarboe bases his breach of contract counterclaim on the HUD Handbook, Cherry Creek is entitled to entry of summary judgment in its favor.

Finally, regarding compliance with state laws, the Court noted in § III.A.2.b. above that it found no legal authority, and Jarboe provided none, that an employer is prohibited from recouping "unearned compensation" provided in the form of overrides.  Jarboe's argument here is that Cherry Creek breached the contract by failing to comply with state

law by attempting to recoup these overrides.  For the reasons stated above, the Court finds that Jarboe has not shown, even taking the facts in a light most favorable to him, that Colorado state law was violated by Cherry Creek.  Thus, summary judgment on this basis in favor of Cherry Creek is appropriate.

Accordingly, Cherry Creek's Motion [#165] is **granted in part.** Summary judgment shall enter in favor of Cherry Creek on Jarboe's breach of contract counterclaim to the extent it is based on purported violations of federal or state law.  This Motion is **denied** with respect to Jarboe's breach of contract counterclaim to the extent it is based on failure to pay Jarboe's full compensation.

### 2.     Conversion

"Conversion is any distinct, unauthorized act of dominion of ownership exercised by one person over personal property belonging to another."  *Byron v. York Inv. Co.*, 296 P.2d 742, 745 (Colo. 1956).  Under Colorado common law, to state a claim for conversion Jarboe must show that: "(i) [Cherry Creek] exercised dominion or control over property; (ii) that property belonged to [Jarboe]; (iii) [Cherry Creek's] exercise of control was unauthorized; (iv) [Jarboe] demanded return of the property; and (v) [Cherry Creek] refused to return it."  *DTC Energy Grp., Inc. v. Hirschfield*, 420 F. Supp. 3d 1163, 1181 (D. Colo. 2019) (quoting *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 863 F. Supp. 2d 1066, 1081 (D. Colo. 2012)).   Importantly, conversion "does not require that a wrongdoer act with the specific intent to permanently deprive the owner of his property."  *Itin v. Ungar*, 17 P.3d 129, 136 n.10 (Colo. 2000). In other words, "[c]onversion is a species of strict liability in which questions of good faith, lack of knowledge, and motive are ordinarily immaterial."  *Scott v. Scott*, 428 P.3d 626, 634 (Colo.

Ct. App. 2018).  "The structure of conversion claims under Colorado law . . . suggests that they function mostly as a legal remedy for the wrongful removal or retention of material things."  *Williams v. Genesis Fin. Techs. Inc.*, 790 F. App'x 161, 165 (10th Cir. 2019).

### a.   Equipment

Cherry Creek argues that it is entitled to summary judgment on the equipment-related portion of Jarboe's conversion counterclaim because he lacks standing to bring such a claim for personal property owned by his business, Strategic Mortgage Corporation ("SMC").  *Motion* [#165] at 11-13.  This goes to the second element of a conversion counterclaim, i.e., the required showing that Jarboe owned the property at issue.  *See DTC Energy Grp., Inc.*, 420 F. Supp. 3d at 1181.

Cherry Creek points to evidence that SMC was a California corporation owned, in whole or in part, by Jarboe.  *Depo. of Jarboe* [#165-2] at 243:7-245:3.  SMC had purchased and owned the personal property located within the Diamond Bar Property, which was commercial real estate located in Diamond Bar, California.  *Id.* at 102:7-103:5. The Diamond Bar branch there later joined First Mortgage Corp. then Primary Residential Mortgage, Inc. ("PRMI"), which used certain equipment during its lease of the Diamond Bar Property.  *Id.* at 139:17-140:12.   That personal property remained at the Diamond Bar Property after PRMI had assigned its leases to Cherry Creek.  *Id.*   Upon its assumption of the Diamond Bar leases, Cherry Creek had access to and use of the personal property located therein.  *Id.*

As of sometime in 2018 or 2019, SMC no longer owned or leased office equipment and had sold the personal property that it had in its possession.  *Depo. of Jarboe* [#165-

2] at 102:15-104:2.  However, the Court finds that there is genuine issue of material fact regarding whether Cherry Creek retained at least *some* of SMC's property when Jarboe left Cherry Creek's employment.  *See Decl. of Jarboe* [#179] ¶ 3 ("After I left Cherry Creek, Cherry Creek kept the property in the branches that stayed with Cherry Creek, including branches in Apple Valley, Riverside, Pasadena, Montebello and Victorville.").   Cherry Creek further asserts that Jarboe "does not contend that Cherry Creek is in possession of [SMC's] personal property."  *Motion* [#165] at 4 (citing *Depo. of Jarboe* [#165-2] at 164:6-11 ("Q. Do you contend that Cherry Creek is in possession of specific items of your personal property?  A. My personal property?  Q. Yes.  A.  No.").  However, the Court agrees with Jarboe that, given the context of the exchange at Jarboe's deposition, there is, at best, a question of fact as to whether either the question or the answer was meant to refer to the office equipment at issue here.

The Court also finds that there is a genuine issue of material fact regarding whether the equipment at issue belonged to Jarboe or to his company SMC.  Jarboe does not contest that SMC owned the equipment that PRMI rented during its time at the Diamond Bar Property.  *Depo. of Jarboe* [#180-7] at 112:17-113:11.  However, Jarboe points to evidence that, on April 21, 2021, SMC, as well as his other company D B Prop, "assigned their claims to Jarboe and ratified Jarboe's claims concerning the real and personal property at issue."  *Response* [#178] at 18 (citing *Ex. E* [#128-1] at 25-26; *Ex. F* [#128-1] at 28-29.  In his May 13, 2021 declaration, Jarboe stated: "I recently noticed that SMC has been suspended and am in the process of reinstating that corporation").  *Decl. of Jarboe* [#128-1] ¶ 2.  Cherry Creek shows that SMC was still suspended, or suspended again, by the California Franchise Tax Board as of October 29, 2021.  *Ex. 13, Entity Status*

*Letter* [#165-13] at 2.  Jarboe presents evidence that SMC returned to good standing as a corporation as of November 26, 2021.  *See Certificate of Status* [#179] at 6.  However, no party presents evidence regarding SMC's standing on April 21, 2021, the date when SMC signed the "Assignment and Ratification" document.  *See United States v. 2.61 Acres of Land*, 791 F.2d 666, 668 (9th Cir. 1985) (applying California law to hold that "a delinquent corporation may not bring suit and may not defend a legal action"); *McLaughlin Land & Livestock Co. v. Bank of Am.*, 94 F.2d 491, 493 (9th Cir. 1938) (applying California law to hold that "the appellant was incapable of performing any corporate acts . . . during the two-year period of suspension").[14]  Thus, there remains a genuine issue of material fact about whether SMC was legally permitted to assign any claims it may have had to Jarboe on the date when it purportedly did so.

Accordingly, Cherry Creek's Motion [#165] is **denied** with respect to Jarboe's counterclaim regarding conversion of office equipment.

### b.    Telephone Numbers

The second part of Jarboe's conversion counterclaim concerns certain telephone numbers which were associated with Jarboe prior to his employment with Cherry Creek. *Response* [#178] at 19-20.  Cherry Creek presents the following evidence regarding this issue.

On May 5, 2016, Cherry Creek was assigned telephone numbers 800-259-0090 and 909-869-6588 by PRMI for use at the Diamond Bar Property.  *Ex. 2, Depo. of Jarboe* [#165-2] at 89:2-11; *Ex. 15, E-mail from Todd Keller* [#165-15] (titled "IT Alert: DB Phone

---

[14]  Cherry Creek asserts: "Because this assignment [from SMC to Jarboe] did not involve Cherry Creek or its contract with Jarboe, California law would presumably govern such an assignment from a California company to a California resident."  *Motion* [#165] at 12.  Jarboe does not contest that California law applies to the assignment.  *Response* [#178] at 18-19.

System swing over, Friday, May 6th, 10am (PST)").  This was done at Jarboe's direction and Cherry Creek used these numbers with Jarboe's permission.  *Ex. 2, Depo. of Jarboe* [#165-2] at 262:12-263:12.  In June 2016, Cherry Creek entered into a 36-month contract with Mitel to service the telephone numbers, an agreement which was set to expire in June 2019.  *Ex. 16, July 2017 E-mail Chain* [#168-2] at 3.

Jarboe had used these telephone numbers at previous employers.  *See Ex. 2, Depo. of Jarboe* [#165-2] at 249:7-250:5.  Jarboe does not possess documentation demonstrating any ownership in these numbers.  *See id.* at 250:18-251:19, 253:19-256:10, 265:6-266:16.  At the time when the telephone numbers were assigned by Jarboe to Cherry Creek, there was no agreement between Cherry Creek and Jarboe for Cherry Creek to transfer the numbers to Jarboe or his subsequent employer.  *See id.* at 90:7-10; 263:13-15.  On June 16, 2017, Jarboe submitted his resignation to Cherry Creek effective June 30, 2017.  *See Ex. 5, June 16, 2017 E-mail from Jarboe to Jeff May et al.* [#165-5]. Sometime after Cherry Creek's employment relationship with Jarboe ended, Cherry Creek released the telephone numbers.  *See Ex. 2, Depo. of Jarboe* [#166-2] at 76:11-13.

Jarboe offers the following evidence in his Declaration:

For years before my employment with PRMI or Cherry Creek, I maintained a local telephone number (909.869.6588) and a toll free "800" number (800.259.0090).  Continuity with these contact numbers is important in my business because people . . . with whom I have done business know that those numbers are how they can contact me.  As I explained during my deposition, even though I owned these numbers, I had to arrange with the telephone providers of my employers to register these numbers in their systems.  Every one of my employers prior to Cherry Creek recognized my "ownership" of those telephone numbers and returned them to me when I left their employ so I could use them for my next employer.  When I left PRMI, I caused the assignment of these telephone numbers from PRMI's

telephone provider for use at Cherry Creek's provider, and PRMI permitted this transition without controversy or requiring me to pay anything.

When I left Cherry Creek, Cherry Creek demanded that I arrange to relieve Cherry Creek of liability for its contract with its telephone provider (Mitel) or take on that liability personally, before they would release my telephone numbers to me. Cherry Creek had no use for these telephone numbers after I left their employment; Cherry Creek intended to close the Diamond Bar branch where these telephone numbers were used. However, Cherry Creek took this opportunity to hold these numbers hostage in order to relieve Cherry Creek of its remaining liability for its contract with Mitel. This required me to spend thousands of dollars, and cost me unknown amounts for lost business opportunities, before I could recover these numbers. Cherry Creek only released the numbers to me after I complied with their demands to pay these amounts to relieve Cherry Creek of its liability for its telephone contract with Mitel.

*Decl. of Jarboe* [#179] ¶¶ 5-6.

Cherry Creek argues that Jarboe had no property interest in the telephone numbers and, even if he did, the property rights belonged to Cherry Creek or, alternatively, that Cherry Creek was using the numbers with Jarboe's authorization. *Motion* [#165] at 13-15. Cherry Creek also argues that Colorado does not recognize conversion with respect to intangible property unless it has been merged with a document. *Id.* at 16-17. The Court begins with this last argument, to which Jarboe made no cognizable response. *See Response* [#178] at 19-20.

First, a telephone number is, by itself, intangible. *See, e.g.*, *T2 Techs., Inc. v. Windstream Commc'ns, Inc.*, No. 14-cv-03151-MSK-KLM, 2016 WL 9735763, at *8 (D. Colo. Sept. 26, 2016) (recognizing that "the right to use a telephone number" is intangible); *In re Al-Naji*, 521 B.R. 65, 72 (W.D.N.Y. Oct. 30, 2014) (stating that "intangibles" include "customer lists and a telephone number"); *Preferred Home Inspections, Inc. v. Bellsouth Telecomm., LLC*, No. 3:14-cv-00673-MBS, 2014 WL 4793824, at *7 (D.S.C. Sept. 24, 2014) ("Given . . . a telephone number's status as

- 30 -

intangible property . . . ."); *In re Andress*, No. 05-11919-M, 20017 WL 2401815, at *1 (N.D. Okla. Aug. 17, 2007) (stating that "the intangible assets of Kite to be purchased included . . . all of Kite's business telephone numbers").  The Court is aware of no Colorado law holding that telephone numbers are tangible.

Second, under Colorado law, an intangible must be converted to a tangible in order for a conversion claim to be cognizable.  In *Williams v. Genesis Financial Technologies Inc.*, 790 F. App'x at 165-66, the Tenth Circuit Court of Appeals examined a conversion claim regarding intangible intellectual property, which the District Court had dismissed as the type of property that could not be converted.  The Circuit noted that "[t]he structure of conversion claims under Colorado law . . . suggests that they function mostly as a legal remedy for the wrongful removal or retention of material things."  *Williams*, 790 F. App'x at 165.  Discussing *McLaughlin v. Clementi*, 355 P.2d 100, 104 (1960), the Circuit noted that the trucking permit at issue there, although an intangible right, "was held [by the Colorado Supreme Court to be] convertible because it fell 'within the category of conversion of a document amounting to the conversion of an intangible right.'"  *Id.* at 166 (emphasis in original).  The Circuit found that the intangible intellectual property at issue could not be converted in the absence of a similar document.  *Id.*  Similarly, in *Tolbert v. High Noon Productions LLC*, No. 20-cv-01734-DDD-NYW, 2021 WL 1877612, at *4 (D. Colo. Feb. 3, 2021), the Court held that a claim for conversion failed where the plaintiff did not allege that the defendant "exercised physical control over any tangible object," thus making the claim "inadequate under Colorado law."  The Court noted that "conversion requires dominion over physical property."  *Tolbert*, 2021 WL 1877612, at *4.

Third, there is no genuine issue of material fact here that Jarboe has not reduced his property right, if any, in the intangible phone numbers to a tangible object, like a document, evidencing that right.  *See Ex. 2, Depo. of Jarboe* [#165-2] at 250:18-251:19, 253:19-256:10, 265:6-266:16.

Thus, even assuming arguendo that a person may have a property right in a telephone number, under Colorado law there can be no successful cause of action for conversion in the absence of merging the intangible property right with a document. Although the Court has found no Colorado case directly on point, South Carolina law appears to be materially similar regarding conversion and intangible property.   In *Preferred Home Inspections, Inc. v. Bellsouth Telecommunications, LLC*, 2014 WL 4793824, at *7, the District Court of South Carolina held:

> Plaintiffs allege that AT & T converted the telephone number when they failed to port it properly.  An action for conversion ordinarily lies only for personal property that is tangible, or to intangible property that is merged in, or identified with, some document.  The Supreme Court of South Carolina is reluctant to expand the tort of conversion as it relates to intangible property and has concluded that actions for conversion should be limited to intangible property rights that are identified with some document. Given the South Carolina Supreme Court's expressed reluctance to expand the tort of conversion to intangible property not attached to a document and a telephone number's status as intangible property, the court concludes a telephone number is not subject to conversion.

(internal citations, quotations marks, and footnote omitted).  Based on the law recited above, and the persuasive authority of *Preferred Home Inspections*, the Court finds that telephone numbers are not subject to conversion under Colorado law.

Accordingly, the Motion [#165] is **granted in part** to the extent that summary judgment shall enter in favor of Cherry Creek regarding Jarboe's conversion counterclaim relating to telephone numbers.

### 3.   Declaratory Judgment

The Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201, "validly confer[s] jurisdiction on federal courts to issue declaratory judgments in appropriate cases." *Calderon v. Ashmus*, 523 U.S. 740, 745 (1998).  The DJA explicitly incorporates the case or controversy requirement of the Constitution by stating: "In a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a).  The Court therefore considers the issue of jurisdiction pursuant to Rule 12(b)(1) with respect to Jarboe's requests for declaratory judgment.  *See, e.g.*, *Van Deelen v. Fairchild*, No. 05-2017, 2005 WL 3263885, at *7 (D. Kan. Dec. 1, 2005).

"It is well established that what makes a declaratory judgment action a proper judicial resolution of a case or controversy rather than an advisory opinion is the settling of some dispute which affects the behavior of the defendant toward the plaintiff." *Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011) (citations omitted).  In other words, "where a plaintiff seeks a declaratory judgment against his opponent, he must assert a claim for relief that, if granted, would affect the behavior of the particular parties listed in his complaint."  *Id.*  To establish that a case or controversy exists, Jarboe must demonstrate that the controversy is: (1) definite, concrete, and touches on the legal relations of the parties, and (2) sufficiently immediate and real.  *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937); *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).  In short, "[t]he ultimate question is whether declaratory relief will have some effect in the real world."  *Van Deelen v. Fairchild*, No. 05-2017, 2005 WL 3263885, at *7 (D. Kan. Dec. 1,

2005) (citing *Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1182 (10th Cir. 2000)).

Further, "[e]ven if subject matter jurisdiction exists, the Court has unique and substantial discretion to determine the propriety of declaratory judgment[.]" *Id.* (citing *Exec. Risk Indem. Inc. v. Sprint Corp.*, 282 F. Supp. 2d 1196, 1202 (D. Kan. 2003)).  The Court has discretion under 28 U.S.C. § 2201 to decide whether to hear a declaratory judgment action.  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 289 (1995) (holding that the statute "vest[s] district courts with discretion in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case or resolution, are peculiarly within their grasp"); *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 982 (10th Cir. 1994) ("The Supreme Court has long made clear that the Declaratory Judgment Act gave the federal courts competence to make a declaration of rights; it did not impose a duty to do so.").

The factors to be considered are:

> (1) whether a declaratory action would settle the controversy; (2) whether it would serve a useful purpose in clarifying the legal relations at issue; (3) whether use of a declaratory remedy is being used merely for the purpose of 'procedural fencing' or 'to provide an arena for a race to res judicata'; (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*St. Paul Fire & Marine Ins. Co. v. Runyon*, 53 F.3d 1167, 1169 (10th Cir. 1995) (quoting *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994)).  These factors are "fact intensive and highly discretionary . . . ."  *Mhoon*, 31 F.3d at 983.  When considering whether to exercise jurisdiction over a declaratory judgment action, courts "must determine whether hearing the case would 'serve the objectives for which the

Declaratory Judgment Act was created.' . . . [W]hen these objectives are served, dismissal is rarely proper . . . ." *Capo, Inc. v. Dioptics Med. Prods., Inc.*, 387 F.3d 1352, 1355 (Fed. Cir. 2004) (internal citation omitted).   The objective of the Declaratory Judgment "Act is to enable resolution of active disputes." *Id.* at 1357.

Here, the Court appears to have subject matter jurisdiction over the controversy underlying this counterclaim, because the parties dispute the meaning and/or application of certain parts of their contracts.   Jarboe seeks declaratory judgment on two remaining topics, asking the Court to declare: (1) that "Cherry Creek must indemnify or pay its employees including Mr. Jarboe for all necessary expenditures and losses incurred in the discharge of their duties in furtherance of Cherry Creek's business," and (2) "that any provisions in employment contracts between Cherry Creek and its California employees, including Mr. Jarboe, which contradict California law or HUD or FHA regulations are unenforceable." *Answer and Counterclaim* [#72] at 21; *Order* [#159] at 14-16; *see also Jarboe's Response* [#178] at 20 (arguing in connection with his declaratory judgment counterclaim that "Cherry Creek's efforts to collect its operating expenses from Jarboe violates HUD's rules and regulations," that "Cherry Creek may not violate HUD regulations simply because it requires employees to enter into various agreements in the abstract," that "Cherry Creek does violate HUD regulations when it uses those agreements to force employees to reimburse it for its expenses and operating deficits," and that "Cherry Creek's enforcement of its NPBM Agreements against Jarboe seeking indemnification . . . for business expenses and losses, violates state laws and [Cherry Creek's] express promise to comply with all federal and state laws and regulations").[15]

---

[15]   As previously noted, Cherry Creek has conceded that it is not seeking to recover operating expenses from Jarboe.   *See Response* [#177] at 21.

However, the Court finds that the discretionary factors here favor Cherry Creek's position.  First, the declaratory action would not settle the controversy, because the primary issue in this case concerns what money damages, if any, are owed under the contracts, an issue which will be adjudicated in connection with Jarboe's breach of contract counterclaim.  Thus, separately clarifying the legal relations between the parties here would be duplicative of the Court's determination of the legal relations between them under the breach of contract counterclaim.  In addition, Jarboe's declaratory judgment requests appear to be a way of procedural fencing; if declaratory judgment is entered in favor of Jarboe, then his breach of contract counterclaim becomes easier to win.  Next, there is no indication that allowing the declaratory action here would have any effect whatsoever on jurisdictional issues between the federal and state courts.  Finally, the alternative remedy which is better or more effective is the simple adjudication of the breach of contract counterclaim.

In short, the issues under the remaining declaratory judgment requests are covered by the breach of contract disputes between the parties, essentially going to the heart of what the parties may or may not owe to one another based on those contracts. There are no continuing or future issues here regarding the parties' relationship because Jarboe is no longer employed by Cherry Creek.  Thus, the only issues are those concerning the parties' former relationship and any monies which one or the other may legally owe under the terms of the contracts and the law governing those contracts.  As such, allowing the declaratory judgment portion of Jarboe's counterclaims to proceed is inappropriate.

Accordingly, Cherry Creek's Motion [#165] is **granted** to the extent that summary judgment is entered in favor of Cherry Creek on Jarboe's declaratory judgment counterclaim.

## IV.  Conclusion

Based on the foregoing,

IT IS HEREBY **ORDERED** that Cherry Creek's Motion [#165] is **GRANTED in part and DENIED in part**.  The Motion is **granted** to the extent that summary judgment is entered in favor of Cherry Creek on Jarboe's following counterclaims: (1) breach of contract, to the extent based on HUD and state law; (2) conversion, to the extent based on telephone numbers, and (3) declaratory judgment.  The Motion is otherwise **denied** concerning Jarboe's following counterclaims: (1) breach of contract (other than breach based on HUD or state law) and (2) conversion, to the extent based on office equipment.

IT IS FURTHER **ORDERED** that Jarboe's Motion [#169] is **DENIED**.

Dated: October 17, 2022

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge